IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Karen Worley, ) | |
| ) | Civil Action No. 6:13-2227-BHH-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Carolyn W. Colvin, ) | |
| Commissioner of Social Security,[1] ) | |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[2]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

### **ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed an application for disability insurance benefits ("DIB") on March 4, 2011, alleging that she became unable to work on March 7, 2010. The application was denied initially and on reconsideration by the Social Security Administration. On August 30, 2011, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and G. Roy Sumpter, an impartial vocational expert, appeared on

---

[1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Fed.R.Civ.P. 25(d), Colvin should be substituted for Michael J. Astrue as the defendant in this case.

[2] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

June 14, 2012, considered the case *de novo*, and on July 25, 2012, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.  The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on June 24, 2013.  The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)   The claimant last met the insured status requirements of the Social Security Act on December 31, 2011.
>
> (2)   The claimant did not engage in substantial gainful activity during the period from her amended onset date of March 7, 2010, through her date last insured of December 31, 2011 (20 C.F.R §§ 404.1571 *et seq*).
>
> (3)   Through the date last insured, the claimant has the following severe impairments: bipolar affective disorder and depression (20 C.F.R. § 404.1520(c)).
>
> (4)   Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).
>
> (5)   After careful consideration of the entire record, I find that through the date last insured, the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: She could perform simple one-two step tasks.  She was also capable of occasional contact with the public and co-workers.
>
> (6)   Through the date last insured, the claimant was unable to perform any past relevant work (20 C.F.R. § 404.1565).
>
> (7)   The claimant was born on July 8, 1961, and was 50 years old, which is defined as a younger individual age 18-49, on the date last insured (20 C.F.R. § 404.1563).
>
> (8)   The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

> (9) Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).
>
> (10) Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 C.F.R. §§ 404.1569 and 404.1569(a)).
>
> (11) The claimant was not under a disability, as defined in the Social Security Act, from March 7, 2010, the alleged onset date, through December 31, 2011, the date last insured (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of

Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments that prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a

> preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 48 years old on her alleged disability onset date (March 7, 2010) and 50 years old on the date last insured (December 31, 2011) (Tr. 85). She has a high school education and past relevant work as a manager of a data department and as a bookkeeper.

### *Physical Health Treatment*

The plaintiff was treated by James R. Hanahan, M.D., at Oconee Family Practice. Her first visit on February 1, 2006, reflects depression, insomnia, and moderate anxiety (Tr. 188, 190).

On March 10, 2006, Dr. Hanahan noted anxiety, depression, chronic lower back pain, diabetes, and "[a]ppearance: anxious with episodes of crying noted" (Tr. 191). On March 16, 2006, Dr. Hanahan recorded anxiety, depression, persistent cough, with more episodes of crying (Tr. 194).

During her April 6, 2006 visit, the plaintiff exhibited multiple joint pain and muscle spasm (Tr. 197). On May 2, 2006, the plaintiff saw Dr. Hanahan for a checkup. The plaintiff's anxiety, depression, and diabetes were recorded (Tr. 200). On May 9, 2006, the plaintiff complained of anxiety, depression, and mood swings. Dr. Hanahan noted, "The

5

patient is brought into the office today by her husband complaining of signs and symptoms of severe depression – that has gotten worse the last 2-3 days – and does not appear to be improving.  Suicidal ideation.  Patient has been on multiple anti-depressants, however, none of the medication appear to be controlling or improving symptoms" (Tr. 202).  At her June 6, 2006 visit, Dr. Hanahan noted anxiety and depression:  "Appearance tired, with patient unable to keep her eyes open during examination.  Mood emotionless" (Tr. 204).  On November 27, 2006, Dr. Hanahan noted right shoulder pain and muscle spasm (Tr. 212).

On February 26, 2007, the plaintiff visited Dr. Hanahan with moderate bilateral shoulder pain and moderate to severe shoulder and neck muscle spasms.  The doctor noted the plaintiff was "going through a divorce" (Tr. 217).  On March 20, 2007, the plaintiff was seen for ear pain, congestion, bipolar disorder, anxiety, chronic low back pain, and depression (Tr. 219).

The plaintiff was seen by April Ross, P.A.C., at Upstate Medical Associates on June 13, 2008.  She complained of left shoulder pain, neck muscle tightness on the left, tenderness in left shoulder with range of motion ("ROM"), and generalized anxiety disorder.  It was noted that she was "[o]nly taking 1/2 tablet of Metformin (for diabetes) due to not having any insurance" (Tr. 250-51).  On July 14, 2008, the plaintiff's neck pain with muscle spasms was still present, and the medication did not appear effective (Tr. 247-48).

On May 13, 2009, Ms. Ross noted that the plaintiff had chronic back pain and needed lab work done for diabetes, but she did not have the money for lab work (Tr. 243).  On November 2, 2009, Ms. Ross recorded the plaintiff's conditions of anxiety and arthralgia in neck, knees, and shoulders.  Ms. Ross stated that the plaintiff needed lab work done for diabetes, but she could not afford it (Tr. 240).

On November 2, 2010, Ms. Ross found the plaintiff to be anxious and her affect incongruent with her mood. The plaintiff complained of arthralgia in the neck, knees, and shoulders (Tr. 328).

The plaintiff was seen by Ms. Ross on January 6, 2011, for a medication refill (Tr. 330). On June 28, 2011, the plaintiff was seen at Foothills Family Medicine by Leeann Butts, who diagnosed chronic, aching myalgias. The plaintiff exhibited shoulder and knee pain, depression, and anxiety. Her left knee was swollen, and she had varicose veins on her extremities (Tr. 331). At her August 15, 2011, visit with Kristen Meyers at Foothills Family Medicine, the plaintiff had neck and shoulder pain, and difficulty raising her left arm. She also exhibited left shoulder pain with internal and external rotation (Tr. 333). On August 18, 2011, Ms. Meyers recorded: "Shoulder still with a lot of pain, falls asleep and prickly down arm. Cannot stand for air to blow on it. Blood pressure at home 180/87. She is uninsured and refuses an MRI today." She noted that the plaintiff's shoulder pain moderately limits activities (Tr. 335).

*Mental Health Treatment*

The plaintiff began treatment with Khizar Khan, M.D., on May 10, 2006. She reported problems with sleep, anhedonia, guilt, low energy, problems with attention/concentration, poor appetite, and mood irritability. "Patient does report somewhat impulsiveness and states: 'I've done some things I can't understand.'" The plaintiff had episodes in which she talked too fast, had flight of ideas, and became hyperactive and impulsive. She had a strong family history of mental illness. Her inability to function as well as take care of her home chores had become more noticeable (Tr. 277-78). On May 17, 2006, the plaintiff reported she had been crying a lot, but was slightly better. She discontinued Seroquel due to grogginess and sedation. She was emotional, tearful, and labile (Tr. 276). On May 25, 2006, Dr. Khan recorded that the plaintiff had discontinued Lamictal due to side effects. She was labile, emotional, tearful, sad, and stated she was

7

"just going back downhill." He diagnosed her with bipolar disorder (Tr. 275). On May 30, 2006, it was noted that the plaintiff was compliant on her regimen, but has been "so down lately" (Tr. 274).

On June 6, 2006, the plaintiff reported that due to Depakote "I can't stay awake and feel so tired." She reported sleeping excessively and that her coordination and gait were not stable. On June 13, 2006, the plaintiff's Depakote was discontinued because of prominent sedation, drowsiness, difficulty walking, and coordination. Her mood was anxious and down. On June 20 and July 17, 2006, it was noted that her mood had improved (Tr. 270, 271).

On November 9, 2006, the plaintiff 's appointment record showed that, while she was compliant on her regimen, she still experienced dysphoria, depression, and panic attacks (Tr. 267).

On December 11, 2006, the plaintiff reported that Cymbalta had not helped her and had caused an irregular heartbeat. She had anxiety and depression. The plaintiff had taken Lexapro and Zoloft for several years, but they were no longer effective. She was concerned because, as of next year, she was unsure of how she would pay for her medications. The plaintiff was emotional, tearful, sad, and overwhelmed (Tr. 266).

On January 8, 2007, Dr. Khan noted that the plaintiff was compliant on her medication regimen, but remained quite overwhelmed as she has lost her insurance, was unable to work, and continued to have marital problems (Tr. 265).

On February 16, 2011, Dr. Khan recorded that the plaintiff had worsening mood symptoms and ongoing decompensation. She reported talking excessively, not being able to finish anything, and being very distractible. The plaintiff was dysphoric, sad, and depressed (Tr. 263).

On March 16, 2011, Dr. Khan noted that the plaintiff's emotional and social struggles have made her feel very isolated. Her grooming and eye contact were only fair.

Her thought process was mildly hyper verbal and over intrusive and had a constricted affect. The plaintiff was sad and tearful with a dysphoric mood (Tr. 262).

On May 12, 2011, Dr. Khan noted that the plaintiff had been treated for some time, but that anxiety remained persistent and distressing. He recommended she increase her Lamictal, but she was unable to "in light of financial constraints" (Tr. 297, 399).

On July 12, 2011, Dr. Khan recorded the plaintiff was having some anxious spells. Her medications were making her feel "very sleepy" and "at times struggle with daily household chores" (Tr. 340).

On November 10, 2011, Dr. Khan noted, "It gets to be overwhelming for her when her routine is changed, becomes anxious...moods tend to be low." The plaintiff's affect was again noted to be anxious and dysphoric (Tr. 341).

At her March 13, 2012, visit, the plaintiff complained of irregular sleep, her hygiene was only fair, she was depressed, and she had a restricted affect (Tr. 342). On April 19, 2012, after treating the plaintiff for five years, Dr. Khan completed a medical source statement opining that the plaintiff met the requirements of Listings 12.04 (Affective Disorders) and 12.06 (Anxiety Related Disorders). Specifically, Dr. Khan stated that she was diagnosed with bipolar affective disorder and anxiety disorder. He stated, that, as of February 16, 2011, the plaintiff did not have the ability to do the following on a continual and regular basis (i.e. eight hours a day, five days a week, or an equivalent forty-hour work schedule): understand, carry out, and remember simple instructions; make simple work related decisions; respond appropriately to supervision, coworkers, or and work situations; and deal with routine work settings. Dr. Khan opined that the plaintiff suffered from mild impairment in activities of daily living; moderate difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; and marked episodes of decompensation. (Tr. 343-46).

*State Agency Medical Opinions*

DDS Physician Samuel D. Williams, M.D., completed a Mental Residual Functional Capacity ("RFC") Assessment of the plaintiff on August 10, 2011. He found moderate limitations in understanding and memory, concentration and persistence, social interaction, and adaption. He limited her to simple one - two step procedures. He noted that changes in work setting should be infrequent and introduced gradually (Tr. 314-16).

*Administrative Hearing Testimony*

The plaintiff testified at the administrative hearing on June 14, 2012, that she weighed about 190 pounds and was 5'6" tall (Tr. 52). She clarified that her weight did not cause her any problems (Tr. 53). She lived with a friend who only stayed with her sometimes. She reported last working at the Bank of Westminster in April or May of 2006. She stopped working when she was terminated for not doing her job well. Since then, she had done some part-time work in 2006 involving graphic design and creating brochures for a restaurant for some friends. She reported "hunt[ing]" for work, but having a difficult time completing job interviews, and never ultimately found any other work (Tr. 34).

The plaintiff indicated that she did not have health insurance. She testified that she had knee problems off and on for a few years, as well as back and shoulder problems. She testified that her right knee would "give out on" her, that it would become numb, and that it hurt to stand for long if she walked very far (Tr. 37). She described the pain in her right knee as a five or six out of ten if she walks too much (Tr. 41). The plaintiff stated that she also had pain in her left shoulder, which caused numbness and neck pain (Tr. 39), and rated it as about a seven out of ten (Tr. 41). With respect to her neck, the plaintiff testified that her left side – including her neck, shoulder, and arm – hurt and that she would become dizzy when her neck hurt "real bad." She believed these symptoms were related (Tr. 40).

When asked if she had had any diagnostic imaging performed, the plaintiff stated that she did not due to a lack of funding and had instead treated with Lortab, muscle relaxers, and anti-inflammatory medications (Tr. 38-39, 41). She noted that she had never had surgery (Tr. 53).

The plaintiff testified that she also had problems with diabetes, but was unsure whether this was the cause of the numbness in her shoulder or whether it was a pinched nerve. When asked if her diabetes was controllable with medication, she said that "[u]sually when I go back it's been climbing over the years. I'm due for some blood work in the next couple of months and I'm not sure I've – the way I feel, I think it's climbing, but I'm not sure. I don't have it documented at this time" (Tr. 39-40). She stated that her high blood pressure was "[n]ot really" controlled with medication and was still high (Tr. 40).

With respect to psychiatric issues, the plaintiff stated that she originally began treatment with Dr. Khan for a suicidal breakdown in 2006. She indicated that, after being treated for bipolar disorder and depression, she had improved and followed the advice of unspecified people she knew and stopped taking her medication. This resulted in her condition worsening again, which is when she returned to Dr. Khan and resumed her medication (Tr. 42). When asked what unwise things she would do while in a manic phase, the plaintiff stated that she made bad judgment choices in her job and in her divorce (Tr. 43-45) and would "live riskier" than she normally would, including doing dangerous things because she would "kind of feel invincible." She clarified, however, that since being on medication, she was "more low" most of the time and not manic. When in a lower state of her bipolar cycle, she indicated that she would keep to herself more (Tr. 43).

The plaintiff testified that she also had severe anxiety and trouble with people and crowds and that there were days she could not even really talk to her mother or daughter on the phone because she could not handle dealing with people. The plaintiff also could no longer go to church regularly because she could not sit in a pew with people

surrounding her. She stated that being confined in a small room would be problematic as well (Tr. 42). When asked about her memory, the plaintiff responded that she was very forgetful and needed reminders (Tr. 45). With respect to concentration, she said her ability to concentrate was not good and that at the time of the hearing she had difficulty following a recipe or concentrating. She did not feel she could do repetitive work due to anxiety. She similarly indicated she could not interact appropriately with customers or coworkers. While there were days she was "okay," there were days when she could not even talk to her family on the phone (Tr. 46).

The plaintiff reported taking Lortab (for pain), Cataflam (an anti-inflammatory), and Flexeril (a muscle relaxer), as well as Aleve and Excedrin (Tr. 38). The plaintiff also reported taking Glucophage XR (metformin) for diabetes (Tr. 39-40). The plaintiff stated she took Lamictal to control her moods and Ativan to help with anxiety, nervousness, and sleep (Tr. 42- 43). The plaintiff reported that her medications made her groggy and sleepy (Tr. 47-48).

When asked how much weight she thought she could lift over an eight-hour day, the plaintiff estimated no more than four or five pounds over six hours and maybe three or four pounds over two hours (Tr. 49-50). The plaintiff testified she could stand for 45 minutes or walk for 45-60 minutes before the pain became unbearable or distracting, and did not think she could stand for four hours or more in an eight-hour day (Tr. 50). The plaintiff testified she could only sit in one place for 30-40 minutes before becoming stiff to the point where she had to move for a few minutes. She testified that she would lie down for about an hour per day (Tr. 51).

The plaintiff further testified that she cooked, though not every day, did the dishes, occasionally did laundry and folded clothes, swept "a little," dusted, cleaned the kitchen "some," but would not mop "much" and would not usually clean the bathroom. She would not vacuum, take out the trash, clean the living room (other than dusting), do yard

work, or garden (Tr. 53-54). She testified that she drove occasionally, but not more than three or four miles. She shopped for groceries, but not clothing (Tr. 55). The plaintiff said she told Dr. Khan she had lost interest in her former hobbies and stated that she could not leave the house as many as five days per month. She clarified that she had never been hospitalized for psychiatric reasons (Tr. 52, 56).

***Vocational Expert Testimony***

Roy Sumpter, Ph.D., testified as a vocational expert at the administrative hearing on June 14, 2012. He classified the plaintiff's past work as the manager of a data department, as well as a bookkeeper (Tr. 57-58). When presented with a hypothetical of a person the same age, educational background, and work experience as the plaintiff, who had no exertional limitations, but was limited to simple one-two step tasks, having only occasional contact with the public and coworkers, the Dr. Sumpter testified that such an individual could not perform any of the plaintiff's past relevant work (Tr. 58). He did, however, testify that such an individual could perform other work that existed in significant numbers in the regional and national economy, including that of a hand packer (DOT 920.587-018), a final inspector (DOT 727.687-054), and a bench assembler (DOT 706.684-042). The ALJ asked if this answer was consistent with Social Security Ruling ("SSR") 00-04p, and Dr. Sumpter confirmed that it was.

The ALJ presented a second hypothetical, with the same restrictions as the first, but with the additional provision that the individual would have periods of decompensation or experience pain leading to absences at least four times per month, and which might interfere with work and cause absences from the work station on a daily basis, from minutes one day to hours another day (Tr. 59). The vocational expert testified that such restrictions would effectively eliminate any type of competitive employment at the skill level in question (Tr. 59).

The plaintiff's counsel then examined the vocational expert and presented a third hypothetical of a person who could only lift four-five pounds occasionally, three-four pounds frequently, could only sit for 30-40 minutes at a time, stand for 45 minutes at a time, would not be able to stand for four hours or more out of an eight-hour day, and would have to lie down for one hour during the workday (Tr. 59-60). Dr. Sumpter testified that such an individual would be unable to perform any of her past relevant work or any other jobs existing in significant numbers in the national economy (Tr. 60). The plaintiff's counsel then offered a fourth hypothetical, the same as the first (provided by the ALJ), but further assuming, based on Dr. Khan's April 19, 2012, medical source statement (Tr. 343), that the individual would lack the ability to do a set of tasks on a regular and continuing basis, eight hours a day, five days a week, or an equivalent 40-hour work schedule (Tr. 60). Before finishing the series of restrictions, the ALJ interrupted counsel's questioning to disallow it, on the basis that the question was not a functional limitation. The ALJ stated that the document the plaintiff's counsel was reading from was not an RFC, but rather, a worksheet that determines severity, which the agency had clarified in a recent training session was not supposed to be asked (Tr. 60). The ALJ clarified that the inability to work on a regular and continuing basis for an equivalent 40-hour week work schedule was permissible (Tr. 60-61). After some discussion, the plaintiff's counsel discontinued the original hypothetical (Tr. 61-62). Instead, the plaintiff's counsel asked a hypothetical of an individual who would lack the ability to maintain appropriate concentration, persistence, and pace at a level that allowed her to perform even simple, routine, repetitive tasks on a regular and continuing basis for eight hours a day, five days a week, during a 40-hour workweek or equivalent work schedule (Tr. 62). The vocational expert responded that such an individual could not perform the plaintiff's past relevant work, or any other work available in the national economy (Tr. 62).

## **ANALYSIS**

The plaintiff argues that the ALJ erred in finding that she had no severe physical impairments (pl. brief at 9-10). A severe impairment is one that significantly limits an individual's ability to do basic work activities. 20 C.F.R. § 404.1520(c). Impairments having only a minimal effect on basic work activities are not severe. *See Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984).

The ALJ noted that the plaintiff alleged that she experienced off and on knee problems and similarly reported problems with her back, shoulders, and neck, as well as numbness in her fingers and arms (Tr. 75, 81). The ALJ found these impairments were not severe because: the plaintiff had not required surgery for any of these conditions; her lumbar impairment had been reported as stable on medications; physical examinations were benign and revealed normal movement of all extremities, and sensation, gait, and strength were normal; there were no diagnostic tests to support a severe shoulder impairment; she did not complain about her physical impairments until July and August 2011, over a year after her alleged onset date of disability, indicating they did not factor into her decision to file for disability; and there was no evidence of continued treatment of physical impairments beyond August 2011 (Tr. 75, 79, 81-82). The ALJ also found that the plaintiff's diabetes and hypertension were not severe impairments because evidence indicated that they were controlled with medication (Tr. 76, 82). Similarly, the ALJ found that the plaintiff's obesity did not constitute a severe impairment because: the record did not reflect any discussion or treatment for obesity, that her weight affected her joints, particularly in her lower extremities, that she had any respiratory or cardiovascular problem, or that she had any diagnosis or ongoing treatment for obesity; and the plaintiff had indicated that her weight did not cause her any physical problems (Tr. 76, 82).

The plaintiff argues that the ALJ's findings are factually incorrect as the evidence shows that she did complain regarding her physical impairments prior to June

2011. Specifically, prior to the amended alleged onset date of March 7, 2010, the record shows the following complaints by the plaintiff: shoulder pain and neck muscle tightness and tenderness with range of motion in June 2008 (Tr. 250-51); neck pain with muscle spasm in July 2008 (Tr. 247-48); chronic back pain in May 2009 (Tr. 243); and arthralgia in neck, knees, and shoulders in November 2009 (Tr. 240). After the alleged onset date, the records reflect the following physical complaints: arthralgia in the neck, knees, and shoulders in November 2010 (Tr. 328); chronic, aching myalgias, shoulder and knee pain, and left knee swelling and tenderness in June 2011 (Tr. 331); and neck and shoulder pain, difficulty raising her left arm, and prickly feeling down arm in August 2011 (Tr. 333, 335). It was also noted during the plaintiff's visits to Foothills Family Medicine that the plaintiff's shoulder complaint "moderately limits activities" (Tr. 333, 335).

The defendant acknowledges that the records do show "physically oriented complaints prior to the alleged onset date of disability" (def. brief at 12) but contends that the evidence as a whole does "not document . . . any evidence of more than a minimal limitation in the ability to function" (*id.*). However, as argued by the plaintiff this is *post-hoc* rationalization not included in the decision since the ALJ admittedly did not consider the evidence of the plaintiff's physical symptoms prior to June 2011 (pl. reply at 6). *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir.2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."). Moreover, as pointed out by the plaintiff, one of her medical providers did state that the shoulder issue "moderately limits activities" (Tr. 333, 335).

As further noted by the plaintiff, the record contains no Physical RFC Assessment from any doctor, including any State agency doctor. Given the evidence of physical impairments in the record and her testimony at the hearing regarding these issues, the plaintiff argues that "there was no logical bridge between the plaintiff's well attested

physical problems and the Commissioner's finding that she had no physical limitations" (pl. brief at 13; pl. reply at 7).

Based upon the foregoing, the undersigned agrees that the ALJ failed to properly consider the plaintiff's physical impairments at step two. Moreover, the undersigned finds that the error is not harmless as it continued and informed the RFC assessment and hypotheticals to the vocational expert at the subsequent steps of the sequential evaluation process. Accordingly, upon remand, the ALJ should be directed to consider all of the record evidence of the plaintiff's physical limitations in making his step two findings and continuing throughout the sequential evaluation process. Further, it is recommended that, upon remand, the ALJ be directed to obtain a Physical RFC Assessment of the plaintiff by a State agency medical consultant. *See* 20 C.F.R. § 404.1513(c).

### *Remaining Allegations of Error*

The undersigned finds that the ALJ's failure to properly consider the plaintiff's physical impairments is sufficient basis to remand the case to the Commissioner; thus, the undersigned declines to specifically address the plaintiff's additional allegations of error by the ALJ. *See Boone v. Barnhart*, 353 F.3d 203, 211 n.19 (3d Cir.2003) (remanding on a particular ground and declining to address claimant's additional arguments). However, upon remand, the Commissioner should take into consideration the remaining allegations of error set forth below:

> 1)   The ALJ failed to recognize that she changed age categories prior to her date last insured (pl. brief at 1, 15). *Compare* Tr. 85 ("The claimant was born on July 8, 1961, and was 50 years old, which is defined as a younger individual age 18-49, on the date last insured.") *with* 20 C.F.R. § 404.1563(d) ("Person closely approaching advanced age. If you are closely

17

approaching advanced age (age 50–54), we will consider that your age along with a severe impairment(s) and limited work experience may seriously affect your ability to adjust to other work.").

2) The ALJ erred in giving little weight to the opinion of treating physician Dr. Khan, who opined that the plaintiff's impairments met Listings 12.04 and 12.06, because the ALJ's reasoning for rejecting the opinion is predicated on a failure to consider the entire record (pl. brief at 10-13).

3) The ALJ failed to consider the records of Dr. Hanahan, who treated the plaintiff for suicidal ideation (pl. brief at 12-14).

4) The ALJ erred in considering evidence of conservative treatment or lack of treatment, and particularly a lack of diagnostic testing, without considering evidence that the plaintiff could not afford treatment (pl. brief at 14-15).

5) The ALJ erred in not permitting the plaintiff's counsel to question the vocational expert concerning restrictions set forth by Dr. Khan (pl. brief at 6-9).[3]

---

[3] In her opening brief, the plaintiff also raised an allegation of error entitled "Medications" (pl. brief at 13). She listed her medications and noted that she suffered side effects including grogginess and sleepiness. The plaintiff further noted that the ALJ found her testimony regarding these side effects to be without merit because Dr. Khan adjusted one of the medications and because the most recent reports from Dr. Khan did not mention any side effects (*id.; see* Tr. 79). The plaintiff did not state in her brief how the ALJ erred. As pointed out by the Commissioner, assuming the plaintiff's

18

## **CONCLUSION AND RECOMMENDATION**

Now, therefore, based on the foregoing, this court recommends that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be remanded to the Commissioner for further consideration as discussed above.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

September 9, 2014
Greenville, South Carolina

---

argument was that the ALJ's determination not to credit her allegations of limiting effects from medications was flawed, the plaintiff does not state how the ALJ erred in his analysis of her credibility in this regard (def. brief at 16-17). The plaintiff does not address the issue in her reply brief. Accordingly, it appears that she had abandoned this allegation of error.